IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NATALIE L. FISHER, | ) | CASE NO. 3:17-cv-01121 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Natalie L. Fisher ("Plaintiff" or "Fisher") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits. Doc. 1. This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14. As explained more fully below, the ALJ's

reasons for the weight assigned to the opinions of Dr. Ahmed, one of Fisher's treating

psychiatrists, and the reasons for assigning greater weight to the opinion of Dr. Watkins, a

consultative examining psychologist, are not sufficiently articulated to allow this Court to

meaningfully assess whether the Commissioner's decision is supported by substantial evidence.

Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision for further

proceedings consistent with this opinion.

## I. Procedural History

On February 7, 2012, Fisher filed applications for disability insurance benefits ("DIB")

and supplemental security income ("SSI"). Tr. 19, 217, 222. Fisher alleged a disability onset

date of June 2, 2011. Tr. 19, 217, 222, 470. She alleged disability due to bipolar disorder,

depression, obsessive compulsive disorder, and hepatitis C.  Tr. 73, 95, 117, 131, 258.  After

initial denial by the state agency (Tr. 117-123) and denial upon reconsideration (Tr. 131-142),

Fisher requested a hearing (Tr. 143-144).  A hearing was held before Administrative Law Judge

Kim Bright ("ALJ Bright") on November 13, 2013.  Tr. 37-69.  On January 21, 2014, ALJ

Bright issued an unfavorable decision (Tr. 16-36), finding that Fisher had not been under a

disability within the meaning of the Social Security Act from June 2, 2011, through the date of

the decision (Tr. 20, 32).  Fisher requested review of the ALJ's decision by the Appeals Council.

Tr. 14-15.  On March 6, 2015, the Appeals Council denied Fisher's request for review, making

the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

On May 4, 2015, Fisher filed an appeal with the United States District Court for the

Northern District of Ohio, Case No. 3:15-cv-00879.  Tr. 628-629.  On August 24, 2016, the court

reversed and remanded the Commissioner's decision (Tr. 675-695) "for reconsideration,

reevaluation and more thorough articulation by the ALJ of the treating physician rule and the

weight given to Dr. Ahmed's opinions and reconsideration and more thorough articulation

concerning Dr. Zake's opinion[]" (Tr. 694).

On September 20, 2016, the Appeals Council issued a "Notice of Order of Appeals

Council Remanding Case to Administrative Law Judge."  Tr. 696-700.  In the order, the Appeals

Council vacated the final decision of the Commissioner and remanded the case to an

Administrative Law Judge for further proceedings consistent with the court's order.  Tr. 698.

While her appeal in federal court was progressing, Fisher had filed another SSI application on

September 23, 2015.  Tr. 698.  As part of its remand order, the Appeals Council ordered that the

claims be consolidated and that a new decision be rendered on the consolidated claims.  Tr. 698.

The Appeals Council indicated that, on remand, the Administrative Law Judge should offer

Fisher "the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision." Tr. 698.

Pursuant to the remand order, on October 31, 2016, Administrative Law Judge Paul Sher ("ALJ") conducted an administrative hearing. Tr. 493-563. On March 1, 2017, the ALJ issued his decision (Tr. 467-490), concluding that Fisher had not been under a disability within the meaning of the Social Security Act from June 2, 2011, through the date of the decision (Tr. 471, 482). Fisher did not file written exceptions with the Appeals Council regarding the ALJ's decision. Doc. 12, p. 4, Doc. 15, p. 2. Thus, the ALJ's decision became the final decision of the Commissioner.[1] On May 30, 2017, Fisher appealed the ALJ's March 1, 2017, decision to this Court. Doc. 1.

## II. Evidence

### A.    Personal, vocational and educational evidence

Fisher was born in 1965. Tr. 217, 481. Fisher has three daughters, who were ages 19, 10 and 6 at the time of the October 2016 hearing. Tr. 506. She lived with her two younger daughters and their father. Tr. 506-507. Her oldest daughter did not live with her. Tr. 507. Fisher completed college and earned a degree in nursing. Tr. 512-513. At one time she was a registered nurse but her nursing license had expired. Tr. 1031. She worked in the past as a waitress and a nurse and she sold pottery and candles at home parties. Tr. 512-517.

### B.    Medical evidence

---

[1] 20 C.F.R. § 404.984 provides that, "when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case." 20 C.F.R. § 404.984(a). Thus, when a claimant does not file exceptions and the Appeals Council does not assume jurisdiction without exceptions being filed, "the decision of the administrative law judge becomes the final decision of the Commissioner after remand." 20 C.F.R. § 404.984(d). Fisher indicates that she did not file exceptions and there is no indication that the Appeals Council otherwise assumed jurisdiction. Doc. 12, p. 4, Doc. 15, p. 2. Thus, the ALJ's March 1, 2017, decision is the final decision of the Commissioner for review by this Court.

### 1.      Treatment history

On June 29, 2011, Fisher presented herself at Substance Abuse Services, Inc. ("SASI")
for a diagnostic assessment, relaying that she needed to "get [her]self together."  Tr. 424.  She
had been in an altercation with a significant other a few days earlier and relayed that she had
started using heroin again two months earlier.  Tr. 424.   Fisher had received prior treatment at
SASI for opiate use.  Tr. 325, 334, 424, 425.  She reported having had anxiety attacks in the past
and was starting to get them again.  Tr. 426.  Fisher reported sleeplessness, chronic fatigue,
persistent worrying, and frequent irritability.  Tr. 426.  Fisher was diagnosed with generalized
anxiety disorder, opioid dependence, cocaine dependence, cannabis dependence, and alcohol
abuse.  Tr. 432.  It was recommended that Fisher start outpatient treatment in SASI's Opioid
Treatment Program (OTP) and Dual Diagnosis Program (DDP), which included individual and
group sessions as well as case management services to address her anxiety disorder, opiate
dependence, cocaine dependence, and cannabis dependence.  Tr. 433.  On November 29, 2016,
Marisa Wojcik, LISW, a counselor at the Zeph Center indicated that Fisher had been attending
counseling at SASI twice a month since June 30, 2011.  Tr. 1254.  Ms. Wojcik relayed that
Fisher had been consistent with her appointments and participated in her sessions.  Tr. 1254.
The counseling included mental health and alcohol and drug counseling.  Tr. 1254.  Ms. Wojcik
did not release the actual counseling records.  Tr. 919.

On August 23, 2011, Fisher was seen at Unison Behavioral Health Group ("Unison") for
a diagnostic assessment.  Tr. 372.  Fisher was living at a shelter.  Tr. 372, 379.  She was
receiving Methadone treatment through SASI and she had started taking Seroquel in July 2011.
Tr. 372.  Fisher wanted to continue with her Methadone treatment and add mental health services
from Unison.  Tr. 372.  She reported attending AA meetings three times per week.  Tr. 376.

Fisher reported not being able to sleep, mood changes and racing and pressured speech. Tr. 378. During the assessment, Fisher initially was unable to sit still and was pacing in the office, looking at pictures, picking up and moving objects, and talking nonstop but later she was almost falling asleep in a chair and forgetting what she was talking about. Tr. 375. Fisher was diagnosed with bipolar disorder, NOS, and opioid dependence (on agonist therapy).[2] Tr. 379. It was also noted that Fisher had hepatitis C, complaints of back pain, and poor sleep. Tr. 379.

On September 26, 2011, Fisher saw Irfan Ahmed, M.D., for a medication appointment. Tr. 370-371. Fisher had been seen previously for her mood swings by Dr. Maria and she had been started on Seroquel Regular and Seroquel XR. Tr. 370. Fisher was concerned about weight gain but reported that the Seroquel had been helping her a lot, her mood was stable, and she was feeling a lot better. Tr. 370. She was interested in staying on Seroquel Regular rather than Seroquel XR. Tr. 370. Fisher doubted her diagnosis but noted that she had always been hyper but sometimes she would get into a depressed phase. Tr. 370. She denied any worsening symptoms of depression or mood swings, she denied psychotic symptoms, and she denied OCD or anxiety symptoms. Tr. 370. On mental status examination, Dr. Ahmed observed that Fisher looked somewhat anxious and stressed out but overall she was cooperative and interactive. Tr. 371. Her mood was somewhat anxious and dysphoric with congruent affect. Tr. 371. Fisher had fair eye contact; her speech was spontaneous with a normal rate, volume and tone; she had no psychomotor agitation or retardation. Tr. 371. Fisher denied suicidal or homicidal ideation; there were no symptoms of psychosis observed; there were no tics or abnormal movements observed; and Fisher's insight and judgment were fair. Tr. 371. Dr. Ahmed continued Fisher on Seroquel 100 mg twice daily and added 200 mg at bedtime in place of Seroquel XR. Tr. 371.

---

[2] "Agonist therapy is the use of a drug (the agonist) that mirrors the effects of an addictive drug." *Sheppard v. Berryhill*, 2018 WL 2183294, *2, n. 2 (N.D. Cal. May 11, 2018).

Dr. Ahmed advised Fisher to follow up in one month, unless earlier follow up was needed, and to keep the Initial Psychiatric Evaluation that had been scheduled with him in November 2011. Tr. 371.

On November 21, 2011, Fisher saw Dr. Ahmed for an Initial Psychiatric Evaluation. Tr. 381-384. Fisher was living in a shelter with her boyfriend of eight years. Tr. 381. She and her boyfriend had two girls together, ages 2 and 5. Tr. 381. Their 5-year old was living with Fisher's mother and her 2-year old lived with her at the shelter. Tr. 381, 382-383. Fisher also had a 15-year old daughter from a prior marriage. Tr. 381, 382-383. Fisher was unemployed. Tr. 381. She used to work as an RN. Tr. 381. Her last job was as a waitress and she reported being fired for talking too fast. Tr. 381. Fisher's chief complaint was that she "need[ed] to be back on my medication. I have problems." Tr. 381. After seeing Dr. Ahmed in September, Fisher had missed her appointment with the nurse so she had been off of her medication for two or three weeks. Tr. 381. She reported feeling irritable and moody. Tr. 381. Fisher reported a prior history of mental health related hospitalizations when she was a teenager. Tr. 382. Fisher reported being sober since returning to SASI in July. Tr. 383. On mental status examination, Dr. Ahmed observed that Fisher looked anxious and tense but she was cooperative and interactive. Tr. 383. She was very fidgety and restless and her speech was pressured. Tr. 383. Dr. Ahmed observed that Fisher's mood was irritable but cooperative, with congruent affect. Tr. 383. Fisher denied suicidal or homicidal ideation and no symptoms of psychosis were observed and no tics or abnormal movements were seen. Tr. 383. Fisher's short-term and long-term memory were intact. Tr. 383. Fisher's intellect was average and her insight and judgment were fair. Tr. 383. Dr. Ahmed diagnosed bipolar disorder, NOS; opiate dependence; marijuana abuse; cocaine abuse; anxiety disorder, NOS; and rule out panic disorder, without agoraphobia. Tr. 384. Dr.

Ahmed started Fisher back on Seroquel as previously prescribed and he added Prozac 20 mg in the morning to help with her reported depression.  Tr. 384.

During a January 12, 2012, appointment with Dr. Ahmed, Fisher was stressed and anxious because her welfare was being cut.  Tr. 367-368.  Jobs and Family Services was requiring her to work 35 hours per week but she was unable to do so because she had to attend meetings for her drug use.  Tr. 367.  Fisher relayed it was hard for her to keep up with things. Tr. 367.  She had moved out of the shelter into an apartment, which provided her some relief but moving had caused a little stress.  Tr. 367.  Fisher reported taking all her medications and tolerating them well with no side effects.  Tr. 367.  Dr. Ahmed observed fair hygiene, grooming and eye contact and a dysphoric mood, with congruent affect.  Tr. 367.  Fisher's speech was spontaneous with a normal rate, volume and tone.  Tr. 367.  He observed no psychomotor agitation or retardation; no symptoms of psychosis; and no tics or abnormal movements.  Tr. 367.  Fisher denied suicidal or homicidal ideation and her insight and judgment were fair.  Tr. 367.  Dr. Ahmed continued Fisher on Seroquel at the same dosage and increased her Prozac to 30 mg.  Tr. 368.  Fisher saw Dr. Ahmed a few weeks later on January 31, 2012, as a walk-in appointment.  Tr. 365-366.  Dr. Ahmed noted that Fisher looked very stressed out and irritable. Tr. 365.  Fisher reported obsessive compulsive behaviors that she had experienced since she was young but had never discussed with Dr. Ahmed.  Tr. 365.  She explained that one of her rituals was counting clothes before placing them in the dryer, fearing that she had to get an exact number or someone in her family would die.  Tr. 365.  Another ritual was raising her feet up off the ground whenever music was playing.  Tr. 365.  Fisher indicated that her repetitive behaviors were getting more frustrating and she was becoming less functional and was stressed out about that.  Tr. 365.  Other than the repetitive behaviors described, Fisher indicated that her mood was

starting to get better and at times she skipped her Seroquel. Tr. 365. Dr. Ahmed's objective observations were similar to those from the earlier January 12, 2012, appointment. Tr. 365. Dr. Ahmed increased Fisher's Prozac to 40 mg to help with her OCD symptoms and referred her to counseling to help with her OCD symptoms using CBT techniques. Tr. 366.

During a March 5, 2012, appointment with Dr. Ahmed, Fisher was in a good mood. Tr. 421-422. She reported that she was doing fine; she had been eating and sleeping well; her mood had been stable; and she denied any major symptoms of psychosis, major mood swings, or depressive symptoms. Tr. 421. She was compliant with her medications and tolerating them well. Tr. 421. Dr. Ahmed continued Fisher on 40 mg of Prozac in the morning, 100 mg of Seroquel twice daily, and 200 mg of Seroquel at bedtime. Tr. 422.

Fisher saw Dr. Ahmed again on April 30, 2012. Tr. 423. Fisher was "somewhat stressed out and anxious." Tr. 423. She indicated that she had her "good days and bad days." Tr. 423. Overall, her mood was more stable. Tr. 423. She was attending church and engaged in community activities. Tr. 423. Fisher had been maintaining her sobriety and she was receiving Methadone daily. Tr. 423. Her sleep was improved and she denied seeing or hearing things and she denied suicidal or homicidal ideation. Tr. 423. Dr. Ahmed continued Fisher on the same medications. Tr. 423.

During a June 19, 2012, appointment, Fisher relayed that she was stressed out due to her daughter being ill and she was worrying about financial issues. Tr. 391. She felt that Prozac was starting to help her with her depression and anxiety. Tr. 391. She was eating and sleeping well and denied any suicidal or homicidal ideation. Tr. 391. Dr. Ahmed observed that Fisher's mood was anxious, her affect was congruent and her range was full. Tr. 391. Fisher's memory and

attention and concentration were intact.  Tr. 391. Dr. Ahmed continued Fisher on the same medications and provided supportive psychotherapy and CBT and supportive therapy.  Tr. 391.

Fisher saw Dr. Ahmed again on August 16, 2012.  Tr. 392.  Although most of her social stressors were reportedly resolving, Fisher was feeling sad and depressed.  Tr. 392.  Her sleep had improved but she was feeling tired.  Tr. 392.  Fisher denied any suicidal or homicidal ideation.  Tr. 392.  Dr. Ahmed found that Fisher's memory and her attention and concentration were intact.  Tr. 392.  Dr. Ahmed increased Fisher's Prozac to 60 mg and continued her Seroquel at the same dosages.  Tr. 392.

When Fisher saw Dr. Ahmed on October 18, 2012, she was a little anxious and sad.  Tr. 393.  She denied having any psychoses.  Tr. 392.  She was having difficulty staying asleep and reported being anxious and nervous over financial worries.  Tr. 393.  She denied any suicidal or homicidal ideation.  Tr. 393.  Her memory and attention and concentration were intact.  Tr. 393. Dr. Ahmed discontinued Fisher's Prozac and started her on Pristiq 50 mg in the morning and he increased Fisher's Seroquel to 300 mg at bedtime and continued her on 100 mg of Seroquel twice each day.  Tr. 393.

When Fisher saw Dr. Ahmed on January 15, 2013, Fisher was in an anxious mood.  Tr. 395.  She relayed that her depression had improved with Pristiq.  Tr. 395.  However, she still had mood swings.  Tr. 395.  She was worried about becoming diabetic.  Tr. 395.  She was sleeping somewhat better.  Tr. 395.  She denied suicidal or homicidal ideation.  Tr. 395.  Dr. Ahmed added 300 mg of Neurontin three times each day for mood stabilization and continued Fisher's other medications.  Tr. 395.

During the end of January 2013 and continuing through September 2013, Fisher had monthly health home appointments with a case manager Michelle Holt, BSW LSW.  Tr. 412-

420.  Also, during the period of February 2013 through August 2013, Fisher attended counseling sessions with Kim Grower Dowling, MA PCC.  Tr. 396-405.  During her counseling sessions, Fisher was anxious and discussed her various life stressors, including issues with her husband and financial concerns.  Tr. 396-405.

On February 12, 2013, Fisher saw Dr. Ahmed and relayed that she was stressing out about her kids, relationship issues, and financial issues.  Tr. 406.  She reported having highs and lows.  Tr. 406.  Some days she was sleeping well and other days she was hardly sleeping at all.  Tr. 406.  She denied suicidal or homicidal ideation.  Tr. 406.  Dr. Ahmed found Fisher's mood to be anxious, her affect was congruent, her range was full, her memory was intact, and her attention and concentration were intact.  Tr. 406.  Dr. Ahmed adjusted Fisher's Seroquel to 400 mg at bedtime and 200 mg twice each day.  Tr. 406.  He continued Fisher on Neurontin and Pristiq at the same amounts.  Tr. 406.

In March 2013, Fisher saw Dr. Ahmed.  Tr. 407.  Dr. Ahmed found Fisher to be sad.  Tr. 407.  She relayed she had been stressed out due to financial concerns and she complained of a lack of motivation.  Tr. 407.  She was getting depressed and feeling down.  Tr. 407.  She was continuing to take her medications and tolerating them well.  Tr. 407.  Dr. Ahmed increased Fisher's Pristiq to 100 mg.  Tr. 407.

When Fisher saw Dr. Ahmed on May 7, 2013, her mood was anxious.  Tr. 408.  A few weeks earlier Fisher had been feeling very stressed out and her therapist had advised her to go to the hospital.  Tr. 408.  Fisher did not go because she was the caregiver for her children.  Tr. 408.  She was starting to feel better and her mood and anxiety were improving.  Tr. 408.  She was eating well and her sleep was improving.  Tr. 408.  Dr. Ahmed noted that adjustments were made to Fisher's medications.  Tr. 408.

During a July 2, 2013, appointment, Fisher was in an anxious mood and relayed that she was having problems paying attention and she was becoming forgetful. Tr. 409. Fisher indicated she had been having problems with attention for a long time. Tr. 409. Overall her mood was stable. Tr. 409. She was eating and sleeping well. Tr. 409. Dr. Ahmed started Fisher on a trial of Straterra, a medication used to treat attention-deficit hyperactivity disorder,[3] and he continued Fisher on her other medications. Tr. 409. The following month, on August 22, 2013, Fisher continued to have an anxious mood. Tr. 410. She felt that the Straterra had improved her focus but she was no longer taking the medication because her insurance did not cover it. Tr. 410. She was stressed out because of a shooting in her neighborhood. Tr. 410. Dr. Ahmed observed that Fisher's memory and her attention and concentration were intact. Tr. 410. She denied suicidal or homicidal ideation. Tr. 410. Dr. Ahmed noted that Fisher's anxiety was situational and he kept her on the same medications. Tr. 410.

During a visit with Dr. Ahmed in November 2013, Fisher was anxious and very worried and overwhelmed by financial issues. Tr. 1170. She talked about past traumatic events and the impact of those events on her emotionally. Tr. 1170. Dr. Ahmed again noted that Fisher's anxiety was situational and he kept her on the same medications. Tr. 1170.

At a January 28, 2014, appointment with Dr. Ahmed, Fisher was very distraught and upset. Tr. 1171. She was very mad about being denied social security benefits. Tr. 1171. She relayed being depressed for a few weeks. Tr. 1171. She was not sleeping well. Tr. 1171. She denied suicidal or homicidal ideation. Tr. 1171. Dr. Ahmed observed that Fisher's mood was sad and anxious. Tr. 1171. Her affect was congruent and her range was full. Tr. 1171. Her memory and her attention and concentration were intact. Tr. 1171. Dr. Ahmed noted that

---

[3] *See* https://www.webmd.com/drugs/2/drug-64629/strattera-oral/details (last visited 7/13/2018).

Fisher's symptoms were situational and he kept her on her current medications. Tr. 1171. The following month, on February 27, 2014, Fisher was in a fair mood. Tr. 1172. She was upset with SASI, indicating that they were telling her to stop taking her medications because they were making her tired during the day. Tr. 1172. She had stayed sober for the prior year. Tr. 1172. Dr. Ahmed observed that Fisher's mood was sad and anxious. Tr. 1172. Her affect was congruent and her range was full. Tr. 1172. Her memory and her attention and concentration were intact. Tr. 1172. She denied suicidal or homicidal ideation. Tr. 1172. Dr. Ahmed noted again that Fisher's symptoms were situational and he kept her on her current medications but he instructed her to divide her Seroquel dose so that she would not be so tired during the day. Tr. 1172.

Fisher had further counseling sessions with Ms. Dowling from May 1, 2014, through December 18, 2014. Tr. 1152-1169. During her counseling sessions, Fisher was anxious and discussed her various life stressors, including issues with her husband, financial concerns, inability to sleep, and concerns about her eating habits. Tr. 1152-1169.

During a May 7, 2014, nurse visit, Fisher relayed that she had not slept in three days. Tr. 1115-1116. She was hyper verbal and manic. Tr. 1115. She planned to go to the emergency room that weekend when the father of her children would be available to watch her children. Tr. 1115. She was staying sober on Methadone. Tr. 1115. On May 9, 2014, Fisher sought treatment at St. Charles Mercy Hospital's emergency room for anxiety and leg swelling. Tr. 968-977. She relayed she had not been taking Seroquel for several weeks because she thought it was killing her. Tr. 968. She indicated she was convinced that she was dying from her medications. Tr. 968. She had no suicidal or homicidal ideation but did indicate that the sometimes felt as if life was not worth living. Tr. 968. She felt very anxious and indicated she

had intermittent leg swelling. Tr. 968. Fisher wanted to be admitted due to many stressors at home. Tr. 968. Fisher was admitted to the psychiatric unit due to her anxiety. Tr. 970-971. Throughout her stay, she denied thoughts of self-harm, suicide or homicide. Tr. 973. When she was advised that she would not be prescribed Methadone while admitted, she requested to be discharged, indicating that she would be kicked out of SASI if she went without Methadone for more than three days. Tr. 973. Due to there being a lack of concern about lethality, Fisher's attending physician discharged her on May 10, 2014, with a diagnosis of bipolar disorder, NOS MRE manic, and opiate dependence. Tr. 973.

On May 19, 2014, Fisher was seen at Zepf Center for a three year review after having entered the OTP/DDP services at SASI in June 2011. Tr. 1187-1197. Fisher reported and a urine screen confirmed that she had been alcohol and drug free since June 1, 2013. Tr. 1187. Fisher indicated she wanted "to stay sober and have [her] mental health be stable." Tr. 1187. She was attending church and participating in a weekly Bible study group at a church in her neighborhood. Tr. 1188. She indicated she enjoyed watching television and spending time with her daughters. Tr. 1188. Fisher relayed that she continued to have regular, ongoing symptoms of anxiety. Tr. 1189. But she was doing better at managing her anxiety attacks. Tr. 1189. Fisher reported being frequently irritable and fatigued but she did not experience loss of concentration. Tr. 1189. She felt that her symptoms impacted her socially and occupationally. Tr. 1189. She continued to see Dr. Ahmed for treatment at Unison. Tr. 1189. Fisher relayed that she had recently attempted to check herself into the psychiatric unit at St. Charles because she "needed a break." Tr. 1189. She also stated that she "believed a hospitalization would help her get Social Security as she was recently denied on her appeal, and [was] very upset about [it]." Tr. 1189. Fisher's diagnoses were generalized anxiety disorder, opioid dependence,

cocaine dependence, cannabis dependence, and alcohol abuse. Tr. 1195. It was recommended that Fisher continue with the OTP/DDP program, attend two sober support activities each week, attend regularly scheduled individual counseling, and complete the non-intensive outpatient program. Tr. 1195, 1197.

Fisher saw Dr. Ahmed again on July 17, 2014. Tr. 1106. Fisher was very emotional and tearful during the whole appointment. Tr. 1106. She had not been taking Seroquel at night because she was afraid she would not wake up at night if her child needed her. Tr. 1006. Due to her lack of medication compliance, she was getting moody and irritable. Tr. 1106. She was also stressed out because her husband was continuing to drink and she had to kick him out of the house. Tr. 1106. She was thinking of switching from Methadone to Suboxone. Tr. 1106. Dr. Ahmed switched Fisher's Seroquel to Seroquel XR 400 mg once a day for compliance reasons. Tr. 1106.

When Fisher saw Dr. Ahmed in September 2014, she was anxious and complained of being nervous, moody and irritable. Tr. 1112. And she was not sleeping well. Tr. 1112. Dr. Ahmed observed a congruent affect and a full range. Tr. 1112. Fisher's memory and her attention and concentration were intact. Tr. 1112. Dr. Ahmed increased Fisher's Seroquel XR to 600 mg to help with mood stabilization and increased her dose of Neurontin to 600 mg, four times each day to help with her anxiety. Tr. 1112.

During a November 6, 2014, appointment, Fisher was anxious. Tr. 1108. She relayed feeling stressed out due to marital problems and financial concerns. Tr. 1108. But overall her mood had been stable. Tr. 1108. She was eating and sleeping well. Tr. 1108. She denied suicidal or homicidal ideation. Tr. 1108. Her memory and attention and concentration were intact. Tr. 1108. Dr. Ahmed noted that Fisher's anxiety was situational and he kept her on her

current medications. Tr. 1108. At her next appointment with Dr. Ahmed on December 29, 2014, Fisher was anxious and stressed about her husband being ill and due to the holidays. Tr. 1114. She had not been sleeping well. Tr. 1114. She was medication compliant and tolerating her medication well. Tr. 1114. Dr. Ahmed noted again that Fisher's anxiety was situational and he kept her on her current medications. Tr. 1114.

During a visit with Dr. Ahmed on February 23, 2015, Fisher was anxious about having recently injured her knee and not being able to see a nurse for her medical care. Tr. 1010. Dr. Ahmed observed an anxious mood with a congruent affect and full range, and intact memory, attention and concentration. Tr. 1010. Dr. Ahmed noted that Fisher's anxiety was situational and he kept her on her current medications. Tr. 1010. In April 2015, Fisher reported being anxious and stressed out about financial concerns. Tr. 1011. Dr. Ahmed's objective observations regarding Fisher's mental status were unchanged from the prior visit. Tr. 1011. Dr. Ahmed noted again that Fisher's anxiety was situational and he kept her on her current medications. Tr. 1011.

An April 24, 2015, SASI update noted that Fisher continued to be alcohol and drug free since June 1, 2013. Tr. 921. She reported no change in her anxiety symptoms but reported no symptoms of panic attacks, depression, mania or psychosis. Tr. 921. It was recommended that Fisher continue in the SASI treatment programs that she had been participating in. Tr. 926.

During a June 15, 2013, visit with Dr. Ahmed, Fisher was anxious and reported being stressed out about family issues. Tr. 1013. Dr. Ahmed's mental status observations were unchanged. Tr. 1013. Dr. Ahmed again noted that Fisher's anxiety was situational and he kept her on her current medications. Tr. 1013.

Fisher cancelled or failed to show for appointments with Ms. Dowling in 2015. Tr. 1018-1023. On July 1, 2015, Ms. Dowling discharged Fisher from individual therapy due to attendance violations. Tr. 1021.

During a September 10, 2015, nurse visit for medication management, Peggyanne Klein, RN, observed that Fisher's mood was depressed and anxious but stable. Tr. 997. Nurse Klein indicated that Fisher's affect was appropriate to content; her thought process was circumstantial and racing; she had good eye contact and was cooperative; her speech was hyper verbal; she had intact memory; and she was easily distracted. Tr. 997. Nurse Klein consulted with Dr. Ahmed's nurse specialist and continued Fisher's medications. Tr. 997.

Fisher saw Dr. Ahmed on November 2, 2015. Tr. 1015.[4] Dr. Ahmed indicated that Fisher appeared "very sad." Tr. 1015. Fisher indicated that she had been feeling very depressed and was stressing out about financial issues. Tr. 1015. She was working on her coping skills. Tr. 1015. She was eating and sleeping well and denied suicidal or homicidal ideation. Tr. 1015. Fisher's memory and her attention and concentration were intact. Tr. 1015. Dr. Ahmed indicated that Fisher's depression was situational and he continued her on her current medications. Tr. 1015.

When Fisher saw Dr. Ahmed on December 28, 2015, Fisher's mood was anxious, her affect was congruent, her range was full, her memory was intact, and her attention and concentration were intact. Tr. 1099. She denied hearing voices or seeing things and she denied suicidal and homicidal ideation. Tr. 1099. She was eating and sleeping well. Tr. 1099. Fisher was in moderate distress due to back and knee pain. Tr. 1099. She was stressed about financial issues. Tr. 1099. Dr. Ahmed found that Fisher's anxiety at that time was due to her

---

[4] The November 2, 2015, medical record is also located at Tr. 1110.

uncontrollable pain.  Tr. 1099.  Fisher planned to see an orthopedic doctor soon.  Tr. 1099.  Dr. Ahmed continued Fisher on her current medications.  Tr. 1099.

On February 16, 2016, Fisher saw Dr. Ahmed.  Tr. 1097.  She was anxious, sad and stressed out about her husband's drinking behavior.  Tr. 1097.  She was also having financial problems.  Tr. 1097.  She was eating and sleeping fine.  Tr. 1097.  Fisher denied any suicidal or homicidal ideation.  Tr. 1097.  Dr. Ahmed noted that Fisher's anxiety was situational and he kept her on her current medications.  Tr. 1097.

A March 22, 2016, SASI update indicated that Fisher continued to maintain her sobriety. Tr. 1204-1209.  Fisher reported having regular, ongoing symptoms of anxiety.  Tr. 1204.  It was recommended that Fisher continue in the SASI treatment programs that she had been participating in.  Tr. 1209.

Fisher saw Dr. Ahmed on April 11, 2016.  Tr. 1173.  She was in an anxious mood and reported being stressed out about financial issues and her daughter's illness.  Tr. 1173.  She was using her coping skills.  Tr. 1173.  Overall, her mood had been stable; she was eating and sleeping well; and she denied suicidal or homicidal ideation.  Tr. 1173.  Fisher's memory and her attention and concentration were intact.  Tr. 1173.  Dr. Ahmed noted that Fisher's anxiety was situational and he kept her on her current medications.  Tr. 1173.  When Fisher saw Dr. Ahmed on June 6, 2016, she was anxious and reported having financial concerns.  Tr. 1174.  Dr. Ahmed again noted that Fisher's anxiety was situational and he kept her on her current medications.  Tr. 1174.

The following month, on July 19, 2016, Fisher was seen by a nurse, Mary Moszkowicz, at Unison.  Tr. 1175-1176.  She saw Nurse Moszkowicz because Dr. Ahmed was no longer at the facility.  Tr. 1175.  Nurse Moszkowicz observed that Fisher's mood was anxious; her affect was

worried/anxious; her thought process was racing; her behavior/functioning was pleasant and cooperative with good eye contact; her speech was hyper verbal; her dress was appropriate; her motor activity was calm; her recent memory was impaired; her remote memory was intact; she was paranoid; and she had a short attention span. Tr. 1175. Fisher relayed that she felt that her medications worked except when she was having a lot of anxiety. Tr. 1175. Fisher indicated she had a lot going on in her life, noting she had two young children and was very busy with them. Tr. 1775. She indicated her sleep was poor and she never felt rested. Tr. 1175. No medication changes were made and Fisher agreed to continue to follow up with a nurse until she had a new doctor. Tr. 1175-1176.

At a subsequent nurse visit on August 12, 2016, (Tr. 1177-1178), Fisher informed Nurse Lynn Keogh, RN, that she was pleased with her improvement and stabilization on her current medications (Tr. 1178). Fisher indicated she was doing "so…so…" Tr. 1177. She relayed that the heat was not good for her and she would be happy once her girls went back to school. Tr. 1177. Fisher was interested in talking with the new doctor about her Seroquel, noting that she only took it if she really needed it and wondered if there was something that would not make her so sleepy. Tr. 1177. Nurse Keogh's mental status findings were generally normal. Tr. 1177.

About two weeks later, on August 29, 2016, Fisher saw Kelly Kinsey, MSN PMHCNS. Tr. 1179-1181. Fisher relayed being anxious and feeling stressed; she was waiting on a disability decision. Tr. 1179. Fisher was not always taking her Seroquel, indicating it made her groggy and she was concerned about weight gain. Tr. 1179. On mental status examination, Nurse Kelly observed that Fisher was alert, oriented and partially cooperative; she was agitated and guarded; she was clean and dressed casually and neatly; her psychomotor activity was normal; she exhibited no abnormal movement; her speech rate was abnormal/pressured; her

mood was anxious with a congruent and expansive affect; her memory and attention and concentration were intact; she had flight of ideas; she denied obsessions, compulsions, delusions, hallucination, suicidal and homicidal ideation; her insight was poor and her judgment was fair. Tr. 1181.  Nurse Kelly noted that Fisher was defensive and agitated when medication adjustments and the need to follow a medication plan were discussed.  Tr. 1179.  Fisher tended to focus on being mistreated by others.  Tr. 1179.  Later in the session, Fisher became more relaxed and less guarded.  Tr. 1179.  Nurse Kelly indicated that Fisher's anxiety was situational.  Tr. 1179.  Nurse Kelly continued Fisher on Neurontin, Pristiq, and Strattera.  Tr. 1180.  She discontinued the Seroquel and added Latuda for mood stability.  Tr. 1181.  Nurse Kelly also recommended that in the future, Fisher should consider stopping/decreasing Strattera and Neurontin.  Tr. 1180-1181.

On September 13, 2016, Fisher started seeing Sreekanth Indurti, M.D., a psychiatrist at the Zepf Center.  Tr. 1218-1223.  Fisher denied depression, suicidal or homicidal thoughts or plans, hallucinations, delusions, and side effects from medication.  Tr. 1218.  Fisher indicated she had been taking her medications regularly.  Tr. 1218.  She wanted to maintain her sobriety and be stable.  Tr. 1218.  She indicated that her anxiety was under control and she was not getting as many panic attacks as she had in the past.  Tr. 1218.  Dr. Indurti indicated that Fisher's mental status examination was unremarkable.  Tr. 1220.  Dr. Indurti found that Fisher appeared to be euthymic and her affect was appropriate.  Tr. 1220.  Her speech, thought processes and contents, and memory were within normal limits.  Tr. 1220.  She had adequate attention and concentration.  Tr. 1220.  Her insight, judgment and abstraction were fair.  Tr. 1220.  Dr. Indurti diagnosed opioid dependence, uncomplicated, and bipolar disorder, current episode depressed, mild.  Tr. 1221.  Dr. Indurti continued Fisher on her current medications.  Tr. 1221.

The following week, on September 21, 2016, Fisher saw Dr. Indurti. Tr. 1227-1230. She had been maintaining well but reported mood swings and feeling as thought people were trying to harm her. Tr. 1227. She was still trying to get disability benefits. Tr. 1227. Fisher could barely walk. Tr. 1227. Dr. Indurti observed no significant changes in Fisher's mental status. Tr. 1227-1228. During an October 5, 2016, visit with Dr. Indurti, Fisher relayed having mild anxiety and agitation and she was still feeling mildly depressed and sad. Tr. 1233-1236. She was taking care of her children with help from her boyfriend. Tr. 1233. She reported having problems with attention and concentration. Tr. 1233. Dr. Indurti found no significant changes in Fisher's mental status. Tr. 1233-1234. Fisher's medications were continued. Tr. 1235. On October 19, 2016, Fisher saw Kelly Frederick, LPN, for a follow up. Tr. 1240-1244, 1245-1248. Fisher relayed that she has having a tough time financially and she was feeling down that day and just wanted to cry. Tr. 1240, 1245. There were no significant changes in Fisher's mental status. Tr. 1240-1241. On November 15, 2016, Fisher saw Kenyatta King, LPN, for a follow up. Tr. 1250-1253. Fisher had circumstantiality of thought processes and was thinking that people were against her and felt that people were mean to her. Tr. 1250. There were no significant changes in Fisher's mental status. Tr. 1250. Fisher's medications were continued with an increase in the Latuda dose. Tr. 1253.

## 2. Opinion evidence

### a. Treating providers

#### *Dr. Ahmed*

On August 16, 2012, Dr. Ahmed completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments (Tr. 385-387) and a To Whom it May Concern note (Tr. 388). Dr. Ahmed opined that Fisher had the ability to remember,

understand and follow directions and the ability to maintain attention and concentration for two-hour periods of time for less than 2/3 of the time, explaining that Fisher had racing thoughts and could be easily distracted.  Tr. 385.  With respect to Fisher's ability to perform work activities at a reasonable pace, Dr. Ahmed opined that Fisher's symptoms impaired her pace severely; she could not have work activities with a fast or externally imposed pace; and she would be more than 25% less productive than an unimpaired worker.  Tr. 386.  With respect to Fisher's ability to keep a regular work schedule and maintain punctual attendance, Dr. Ahmed opined that, due to psychiatric-based symptoms, Fisher would be absent, late or leave early more than 3 times per month.  Tr. 386.  With respect to Fisher's ability to interact appropriately with others, Dr. Ahmed opined that Fisher was unable to consistently interact in a manner that would be appropriate to customer expectations and she would not be successful in working with the public.  Tr. 386.  Also, Dr. Ahmed opined that Fisher was likely to have emotional blowups or outbursts directed to coworkers or supervisors on an average of more than once every other month (over six times per year).  Tr. 386.  With respect to Fisher's ability to withstand stresses and pressures of routine, simple unskilled work, Dr. Ahmed opined that Fisher was emotionally fragile; stress caused by even routine and unskilled or low-skilled work was likely to cause her to decompensate; and she would be likely to be successful only in a sheltered environment, adding as explanation that Fisher had mood swings and mood lability.  Tr. 387.

In his To Whom it May Concern August 16, 2012, note, Dr. Ahmed stated "This is to certify that Ms. Natalie Fisher is under my care.  Lately she has been stressed out.  She needs rest.  She is not ready to work.  We recommend her to rest and avoid stressful situations."  Tr. 388.

On October 17, 2013, Dr. Ahmed completed an Updated Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments. Tr. 451. In that statement, Dr. Ahmed affirmed that Fisher's mental limitations remained the same that they had since August 16, 2012, as reflected in the statement previously completed on that date. Tr. 451. Dr. Ahmed opined that Fisher's mental impairments had persisted despite compliance with treatment; the limitations identified on August 16, 2012, would exist regardless of the use of any substances; and Fisher continued to have limitations that last or were expected to last for at least 12 months. Tr. 451.

### Dr. Indurti

On November 3, 2016, Dr. Indurti completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments. Tr. 1215-1217. In that statement, Dr. Indurti explained that Fisher suffered from bipolar disorder with most of her recent episodes involving depression and anxiety. Tr. 1217. Dr. Indurti opined that Fisher was unable to follow multi-step but simple instructions, detailed instructions, and complex instructions; she would be off task 20% or more of the workday; she would require close supervision in order to stay on task because she was unable to sustain attention and concentration; and, due to her psychiatric-based symptoms, she would be absent, late or leave early three or more times per month. Tr. 1215. Also, Dr. Indurti opined that Fisher would be unable to consistently interact in a manner that is appropriate to customer expectations and would not be successful in working with the public; could not work around coworkers and must work in an isolated setting; would be unable to consistently interact in a manner that is appropriate to employer expectations and would not be successful in working with supervisors; would be unable to perform a job in which a fast pace or externally imposed pace is an essential

feature (e.g., assembly line work) but would be able to perform an average-paced job; and would be unable to perform an average-paced job without a reduction in productivity of greater than 20% compared to an unimpaired worker.  Tr. 1216.

### b. Consultative examiners

*Dr. Jerome Zake, Ph.D.*

*October 17, 2013, Consultative evaluation*

On October 17, 2013, psychologist Jerome Zake, Ph.D., evaluated Fisher and prepared a disability assessment report.  Tr. 457-462.  Fisher's chief complaint was having a lot of anxiety. Tr. 457.  She relayed that in 2004 she had lost a lot of people and had not been the same person since that time.  Tr. 457.  Dr. Zake found that Fisher appeared manic during the evaluation.  Tr. 459.  When Dr. Zake asked Fisher to describe her mood, she explained she had a bad week and was feeling stressed out.  Tr. 459.  Fisher indicated that, about every other week, she does not sleep at night and then she crashes after two days.  Tr. 459.  Dr. Zake noted that Fisher spoke in complete sentences with normal articulation but her conversation was very pressured in terms of velocity and her comments were rambling in nature.  Tr. 459.  Fisher described being anxious about her children's safety, financial issues, and weight and indicated she worried about everything.  Tr. 460.  She explained that she had frequent panic attacks, which caused shortness of breath, feelings of being shut in, and sweating.  Tr. 460.  Fisher indicated that if she is able to calm herself, her panic attacks do not last long.  Tr. 460.  Dr. Zake found that Fisher appeared to be preoccupied with her mental health issues and her children's safety.  Tr. 460.  Dr. Zake also found that Fisher was somewhat suspicious, noting that she was hesitant to disclose information to him.  Tr. 460.

Dr. Zake noted that Fisher was alert during the evaluation but Fisher's responsiveness during the evaluation was poor because of her excessive rambling. Tr. 460. Fisher could recall recent events after a response time delay and could name the current and past Presidents of the United States, with a long recall time noted for recalling the past President. Tr. 460. She could correctly compute serial sevens when both ascending and descending. Tr. 460. She showed immediate recall of six digits forward and seven digits backwards and correctly solved orally presented addition, subtraction and multiplication facts and an orally presented story problem involving money. Tr. 460. She could explain a common proverb. Tr. 460.

Fisher cleaned a lot. Tr. 460. She stated she was responsible for doing all the chores, which she felt was a lot. Tr. 460. She explained she procrastinated and would get bored with tasks and then move on to other matters without finishing the task. Tr. 460. As far as a daily routine, Fisher relayed that she attended her drug treatment program in the morning and got her daughter ready for school. Tr. 460. Fisher said there was a neighbor who helped her out and her current interests included cleaning and being with her children. Tr. 460. Fisher relayed that she liked it when she did not have to leave the house. Tr. 460.

Dr. Zake concluded that Fisher's cognitive skills were estimated to be in a range from average to high average. Tr. 461. Dr. Zake found that Fisher would likely have difficulty carrying out instructions given the variations in her mood. Tr. 461. He also found that Fisher's pace was extremely pressured and her persistence appeared to be dependent on her mood. Tr. 461. Also, her excessive rambling interfered with her interpersonal relationships and she was easily stressed and anxious. Tr. 461. Dr. Zake found that Fisher's prognosis appeared guarded. Tr. 461. Dr. Zake diagnosed Fisher with bipolar I disorder, most recent episode manic, moderate

to severe; social phobia, moderate; and opioid dependence, early full remission, on agonist therapy.  Tr. 462.

Dr. Zake provided an assessment of Fisher's functional abilities.  Tr. 461-462.  With respect to Fisher's abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Zake found that Fisher had adequate understanding and recall and her ability to carry out instructions appeared to be dependent on her mood variations.  Tr. 461.  With respect to Fisher's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks, Dr. Zake found that Fisher had adequate concentration but her pace was extremely pressured and her persistence appeared to vary depending on her mood.  Tr. 461.  With respect to Fisher's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, Dr. Zake found that Fisher's excessive rambling would interfere with interpersonal relationships.  Tr. 461.  With respect to Fisher's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Zake found that Fisher would be prone to have increased levels of anxiety and possibly mood fluctuations when confronted with stress.  Tr. 462.

### November 3, 2013, Medical Source Statement

On November 3, 2013, Dr. Zake completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  Tr. 463-465.  Dr. Zake rated Fisher's abilities in various areas.  Tr. 463-465.  Dr. Zake found that Fisher's ability to understand, remember, and carry out instructions was affected by her impairment, finding that she had moderate limitations in her ability to carry out complex instructions and in her ability to make judgments on complex work-related decision.  Tr. 463.  Dr. Zake explained that Fisher described fluctuations in her mood which would interfere with her ability to carry out complex instructions or make judgments and

she presented as manic which would also have a negative impact. Tr. 463. Dr. Zake found that Fisher's ability to interact appropriately with supervision, coworkers and the public and her ability to respond to changes in a routine work setting were affected by her impairments, finding that she had mild limitations in her ability to interact appropriately with the public and in her ability to respond appropriately to usual work situations and to changes in a routine work setting and marked limitations in her ability to interact appropriately with supervisors and coworkers. Tr. 464. Dr. Zake explained that Fisher's mood variations and anxiety around interacting with others would impact her abilities in those areas. Tr. 464. Dr. Zake was unable to offer an opinion as to when the limitations identified were first present. Tr. 464. Dr. Zake opined that Fisher appeared to be coping adequately with her opioid dependence given her then current treatment. Tr. 464.

*Dr. Daniel K. Watkins, Ph.D.*

On December 23, 2015, Daniel K. Watkins, Ph.D., conducted a consultative psychological evaluation. Tr. 1030-1036. Dr. Watkins observed that Fisher was circumstantial, at times tangential, and rambled a lot. Tr. 1033. Fisher relayed that she had been feeling "bad, down, tired, and sleepy[]" and Dr. Watkins noted that clinically Fisher appeared anxious and agitated. Tr. 1033. When depressed, Fisher indicated she felt hopeless. Tr. 1033. Fisher reported periods of hypersomnia as well as periods of requiring little sleep. Tr. 1033. She complained of racing thoughts and OCD symptoms. Tr. 1033-1034. Dr. Watkins' diagnoses were unspecified bipolar disorder and related disorder; OCD; opioid use disorder, sustained full remission (per Fisher's report); and substance abuse – polysubstance dependence, sustained full remission (per Fisher's report). Tr. 1035.

Dr. Watkins provided a functional assessment. Tr. 1036. With respect to Fisher's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Watkins opined that Fisher retained the ability to understand, remember and carry out concrete or abstract instructions of simple, moderate or fairly high complexity. Tr. 1036. Dr. Watkins opined that Fisher would have moderate limitations in the area of maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and multi-step tasks. Tr. 1036. Dr. Watkins opined that Fisher would have moderate limitations in the area of responding appropriately to supervision and coworkers, noting that at times her anxiety, pressured speech, and rambling could be off-putting to coworkers or customers or otherwise disruptive to an ordinary workplace. Tr. 1036. Dr. Watkins opined that Fisher would have at least moderate limitations in the area of responding appropriately to work pressures in a work setting, noting that Fisher could probably cope with a low-pressure work setting involving relatively little customer or other public contact. Tr. 1036.

### c. Reviewing psychologists

*2012 reviewing opinions*

On March 28, 2012, state agency reviewing psychologist Karla Voyten, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 76-77) and Mental RFC Assessment (Tr. 78-80). In the PRT, Dr. Voyten opined that Fisher had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 77. In the Mental RFC Assessment, Dr. Voyten opined that Fisher could perform simple and moderately complex tasks; work should be simple and repetitive in nature

with no high production quotas; and Fisher should have no more than superficial interaction with the general public.  Tr. 79-80.

Upon reconsideration, on August 8, 2012, state agency reviewing psychologist Cindy Matyi, Ph.D., completed a PRT (Tr. 98-99) and Mental RFC Assessment (Tr. 100-102).  In the PRT, Dr. Matyi opined that Fisher had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 99.  In the Mental RFC Assessment, Dr. Matyi opined that Fisher's condition restricted her capacity for detailed/complex tasks but she could comprehend, remember and carry out simple (1-2 step) and occasional complex (3-4 step) instructions.  Tr. 100-101.  Dr. Matyi found that Fisher was moody and suspicious which compromised her sustainability and would make her concentration and pace variable but she could nonetheless maintain attention, make simple decisions, and adequately adhere to a schedule.  Tr. 101.  As far as social interactions, Dr. Matyi opined that Fisher's condition made her susceptible to misperceiving interpersonal nuance.  Tr. 101-102.  Dr. Matyi explained further that, although Fisher would likely perform best in a setting that involved minimal interaction, she could relate adequately on a superficial basis.  Tr. 102.  Dr. Matyi also opined that Fisher's symptoms would exacerbate in the face of perceived stressors which would put her at risk for relapse but she could adapt to a setting in which duties were routine and predictable and change was well explained and introduced slowly.  Tr. 102.

*2016 reviewing opinions*[5]

On January 8, 2016, state agency reviewing psychologist Deryck Richardson, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 651-652) and Mental RFC Assessment (Tr. 654-656). In the PRT, Dr. Richardson opined that Fisher had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 652. In the Mental RFC Assessment, Dr. Richardson opined that Fisher could perform 3-4 step tasks in a setting with little or no demand for speed; could work with superficial and occasional contact with others; and could work in a static setting with infrequent changes. Tr. 655-656.

Upon reconsideration, on March 31, 2016, state agency reviewing psychologist Audrey Todd, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 665-666) and Mental RFC Assessment (Tr. 669-671), reaching the same opinions as Dr. Richardson.

**C.    Testimonial evidence**

**1.    Plaintiff's testimony**

Fisher was represented and testified at the October 31, 2016, hearing.[6] Tr. 502-554, 561-562. During her testimony, Fisher discussed how her mental health impairments impacted her ability to function both at home and while in public. Tr. 502-554.

---

[5] The 2016 state agency reviewing opinions were rendered in connection with the 2015 application for benefits that was filed while Fisher's appeal was pending in federal court.

[6] Fisher also testified at the November 13, 2013, which took place prior to the federal district court's remand order. Tr. 42-64.

She relayed that she is depressed a lot and also has times when she is really up. Tr. 551-552. She now has more down than up days. Tr. 552. Fisher tries to do some chores at home but Michael, the father of her two children, who lives with her, helps her out at home with chores and caring for their daughters. Tr. 529, 550. Her six-year old daughter has a sensory integration disorder, which causes her not to experience pain in a normal way. Tr. 508. If Fisher doesn't walk her daughter to school, her daughter's father does or she walks with her sister. Tr. 509. Fisher's ten-year old daughter did well in school but was receiving treatment for anxiety. Tr. 534-535. More recently, Fisher's mother was going to start helping out with the kids more regularly. Tr. 550. Her mother used to get Fisher's kids every so often but she was going to start getting them every weekend because she was planning on retiring. Tr. 537-538, 550-551. Fisher's mother was working two jobs and helped out when she could but was trying to retire. Tr. 537-538, 550-551. Fisher gets very overwhelmed by things and gets easily distracted when performing things like household chores and she ends up not being able to finish them. Tr. 547-550. Fisher explained that, while she told Dr. Watkins that she did cooking and a little housecleaning, she only told people she did things around the house so it would not seem like she was a bad mom. Tr. 536-537. Fisher provides some assistance to her daughters with their homework. Tr. 540-541. Fisher has a big dog. Tr. 541-542. At times, she helps take care of the dog but she had not been caring for the dog a lot because of her depression so Michael had been taking care of the dog. Tr. 542.

Fisher has a case manager that takes her to the grocery store about once a month. Tr. 544. Her case manager will also take her at other times if Fisher calls her. Tr. 544. Fisher has a difficult time being around people. Tr. 552-553. She explained she was in a waiting room at an office and felt like all the people in the room were crowding in on her. Tr. 552-553. Fisher

feels that people hate her and are mean to her.  Tr. 524, 543, 546.  However, she also

acknowledged that, while she felt that individuals from the church did not like her, they had

reached out to her and came to her house to encourage her to continue participating in church

activities.  Tr. 524-525.

Fisher enjoys watching old television programs and spending time with her children.  Tr.

540.  She does not go to movies very often because of the cost and she does not like going to

movies.  Tr. 541-542.  Fisher enjoys reading but does not read very often because she has a hard

time focusing.  Tr. 550.  Fisher tries to attend church.  Tr. 520-521.  The church is about five

blocks away and she gets picked up by a church van.  Tr. 521.  There is a bible study session at

the church that she also tries to attend.  Tr. 523-525.

## 2.  Vocational Expert

Vocational Expert ("VE") Mary Everts testified at the October 31, 2016, hearing.[7]  Tr.

554-560.

## III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work

---

[7] Fisher's arguments in this appeal do not pertain to the VE's testimony.  Accordingly, the VE's testimony is not
summarized herein.

experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 1, 2017, decision, the ALJ made the following findings:[11]

1.   Fisher meets the insured status requirements of the Social Security Act through June 30, 2013.  Tr. 472.

2.   Fisher has not engaged in substantial gainful activity since June 2, 2011, the alleged onset date.  Tr. 472

3.   Fisher has the following severe impairments: bipolar disorder; degenerative disk diseases of the sacroiliac and lumbar spine; and osteoarthritis of the left knee.  Tr. 473.  Fisher also has a non-severe impairment of a history of drug addiction to heroin/opioids.  Tr. 473.

4.   Fisher does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 473-475.

5.   Fisher has the RFC to perform light work except she: can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can frequently balance; can occasionally stoop, kneel, crouch and crawl; can understand, remember and carry out simple instructions; can perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; can adapt to routine changes in the workplace that are infrequent and easily explained; and can interact occasionally with supervisors and coworkers and never with the general public.  Tr. 475-481.

6.   Fisher has no past relevant work.  Tr. 481.

7.   Fisher was born in 1965 and was 45 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 481.

8.   Fisher has at least a high school education and is able to communicate in English.  Tr. 481.

---

[11] The ALJ's findings are summarized.

9. Transferability of job skills is not an issue because Fisher does not have past relevant work. Tr. 481.

10. Considering Fisher's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Fisher can perform, including garment sorter, inspector/packer, and sorter. Tr. 481-482.

Based on the foregoing, the ALJ determined Fisher had not been under a disability, as defined in the Social Security Act, from June 2, 2011, through the date of the decision. Tr. 482.

## V. Plaintiff's Arguments

Fisher argues that the RFC is not supported by substantial evidence because the ALJ failed to provide good reasons for the weight assigned to the opinion of her treating psychiatrist, Dr. Ahmed. Doc. 12, pp. 15-21, Doc. 16. She also argues that the RFC is not supported by substantial evidence because the ALJ gave greater weight to the opinion of one-time consultative examiner Dr. Watkins than to the opinions of Fisher's treating psychologists (Dr. Ahmed and Dr. Indurti) and a second consultative examiner, Dr. Zake, without sufficiently explaining his rationale. Doc. 12, pp. 21- 23.

## VI. Law & Analysis

### A. Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.      Opinion of treating psychiatrist Dr. Ahmed

Fisher argues that the ALJ erred by failing to give appropriate weight to the opinion of her treating physician, Dr. Ahmed. Doc. 12, pp. 15-21, Doc. 16, pp. 1-4.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ

must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ considered Dr. Ahmed's opinion evidence and explained the weight assigned and the reasons for that weight, stating:

> Turning to the opinion evidence, in a medical source statement, comp[l]eted in August 2012,[12] Irfan Ahmed, M.D., opined that the claimant would be able to remember, understand and follow directions for simple tasks for less than 2/3 of the time, she would be able to stay on task for less than 2/3 of the time, she would be more than 25% less productive than an unimpaired worker, she would be absent, late or leave early more than 3 times per month, she would be unable to consistently interact in a manner that is appropriate to customer expectations, and would not be successful in working with the public, and the stress caused by even routine and unskilled or low-skilled work is likely to cause her to decompensate. (Exhibits 4F, 12F). Dr. Ahmed also opined, "to whom it many concern," the claimant has been "stressed out, and she needs rest. She is not ready to work. I recommend she rests and avoid stressful situations." (Exhibit 12F at 5). I have given partial weight to Dr. Ahmed's opinion. I have given great weight to the limitations regarding working with the public, as they are consistent with the medical record as a whole. However, the rest of the opinion is not consistent with Dr. Ahmed's own records, this is a very old opinion and does not reflect the claimant's current status, as she is apparently able to care for fairly young children at home, which can be quite demanding both physically and emotionally, without any particular assistance, and she is able to maintain a relationship with her boyfriend and others.

Tr. 478-479.

---

[12] The ALJ did not specifically refer to Dr. Ahmed's October 2013 statement wherein he affirmed that the mental limitations identified in his August 2012 statement remained the same. The ALJ did cite Exhibit 12F, which is Dr. Ahmed's October 2013, statement, when explaining the weight assigned to Dr. Ahmed's opinion evidence. Tr. 478

The ALJ stated reasons for providing only partial weight to Dr. Ahmed's opinion. However, without a more thorough explanation by the ALJ, the Court cannot assess whether the reasons provided for assigning only partial weight are "good reasons" supported by substantial evidence. For example, the ALJ does not explain how the opinions of Dr. Ahmed, which were not provided great weight, were not consistent with his records. While the ALJ had earlier discussed Fisher's medical treatment records, the ALJ's cursory statement regarding inconsistencies between Dr. Ahmed's opinions and his treatment records does not allow this Court the ability to assess whether the stated reason is a "good reason" for discounting portions of Dr. Ahmed's opinion.

Also, without a more reasoned analysis, the Court cannot assess whether the ALJ's other stated reasons are "good reasons" supported by substantial evidence. Considering the age of Dr. Ahmed's opinions, the ALJ discounted them, finding that they did not take into account Fisher's more current status, which, according to the ALJ, included the apparent ability to care for her young children without any particular assistance. Tr. 479. It is correct that Dr. Ahmed's are not the most current opinions in the record – they are dated August 2012 and October 2013. Tr. 385-388, 451-455. However, Fisher's alleged onset date is June 2, 2011 (Tr. 470) and Dr. Ahmed started treating Fisher in September 2011 (Tr. 370-371). Thus, Dr. Ahmed's opinions relate to a portion of the relevant period, i.e., June 2, 2011, through the date of the ALJ's decision. Additionally, the ALJ's determination that Fisher is able to care for her young children, without any particular assistance (Tr. 479), is contradicted by the record. For example, Fisher testified that she tries to do some chores at home but Michael, the father of her two children, who lives

with her, helps her out at home with chores and caring for their daughters.[13] Tr. 529, 550. And she testified that her mother helped her and was going be helping with her children more regularly since she was planning to retire. Tr. 537-538, 550-551. In light of the foregoing, without further analysis by the ALJ, the Court cannot assess whether his decision to discount the opinion of a long-time treating psychiatrist because it is an "old" opinion that did not reflect Fisher's current status is a "good reason" supported by substantial evidence.

For the reasons discussed herein, remand is warranted for further articulation of the weight assigned to Dr. Ahmed's opinions and more complete explanation of the reasons for that weight.

**C.    Opinion of consultative examining psychologist Dr. Watkins**

Fisher also challenges the ALJ's decision to assign great weight to the opinion of the consultative examining psychologist Dr. Watkins, arguing that the ALJ's explanation is without sufficient detail and/or unsupported by the record considering that the opinion is inconsistent with the treating psychiatrist opinions and the opinion of the other consultative examiner, Dr. Zake. Doc. 12, pp. 21-23.

The ALJ discussed the opinion of Dr. Watkins and assigned great weight to his opinion, stating:

> I have given Dr. Watkins' opinion great weight as it is consistent with the medical record as a whole, it provides insight into the severity of the claimant's impairments and how they affect her ability to function, and it has been provided for in the residual functional capacity with a limitation for simple instructions, simple, routine, and repetitive tasks, not at a production rate pace, routine changes in the workplace that are infrequent and easily explained, and occasional interaction with supervisors and coworkers and never with the general public.

---

[13] The Court notes that in the previous remand order, the court found that reliance upon daily activities to discount Dr. Ahmed's opinion was misplaced in part because, "while [Fisher] does perform some daily activities, they are mostly done with the aid of others." *See* Tr. 692.

Tr. 479.  Considering that his opinion was given greater weight than the two treating psychiatrist opinions and the other consultative examining psychologist's opinion who found Fisher more restricted, the Court finds that the conclusory explanation provided by the ALJ is insufficient to allow this Court a meaningful opportunity to assess whether the ALJ's weighing of the medical opinion evidence is supported by substantial evidence.  Accordingly, on remand a more thorough explanation as to the basis for finding Dr. Watkins' opinion entitled to great weight as consistent with the medical record as a whole is required.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

Dated: July 13, 2018

_/s/ Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge